### CLUNE v. RISTINE.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1899.)

No. 1,032.

1. RAILROADS—OBSTRUCTION ON TRACK—NEGLIGENCE.

A rock weighing some 200 tons, which was embedded in the face of the slope of a railroad cut along the side of a mountain, slid from its place, in the night, upon the track, and an engine attached to a train, coming in collision with it, was wrecked, and the engineer killed. The cut was through a formation known as "slide," consisting of loose boulders embedded in clay or gravel and the slope stood at an angle of about 45 degrees. The road had been built about eight years, during which time no change had been made in the slope, and the only inspections had been made by observations from passing trains or hand cars. The bank was regarded as safe by the company's engineers. There had been no recent rains, and no night patrol of the cut was being made at the time. *Held*, in an action against the railroad company to recover for the death of the engineer, that such facts did not warrant a peremptory instruction for the defendant, but that the question whether it had exercised ordinary

care to construct and maintain its track in a reasonably safe condition was one for the jury.

2. DAMAGES—ACTION FOR WRONGFUL DEATH—EVIDENCE IN MITIGATION.

In an action for wrongful death the defendant is not entitled to prove in mitigation of damages that plaintiff has received insurance on the life of the deceased from a collateral source wholly independent of defendant.

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Colorado.

Edmund F. Richardson (Thomas M. Patterson and Horace N. Hawkins, on the brief), for plaintiff in error.

Henry T. Rogers (Lucius M. Cuthbert, Daniel B. Ellis, and George C. Preston, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This record presents the general question whether a peremptory instruction to return a verdict in favor of George W. Ristine, receiver of the Colorado Midland Railroad Company, the defendant in error and the defendant below, was properly given. At the conclusion of the plaintiff's testimony the facts which had then been established were substantially as follows: On August 21, 1894, J. B. Blocker, who was the son of Mary E. Clune, the plaintiff in error, and the plaintiff below, was employed as a railroad engineer, and was engaged in running freight trains over the railroad of the Colorado Midland Railroad Company, between Colorado City and Leadville, Colo. On the night of that day, as he was running his train through Eleven Mile cañon, which is some distance west of Florence, Colo., and had proceeded up the cañon about eight miles, his engine came in contact with a large rock that had slid down upon the track from the slope on the south side of the track in which it had been embedded, the result being that the engine was overturned, and the plaintiff's son was instantly killed. The rock in question was a granite boulder from 22 to 25 feet long, and was found to be from 5 to 6 feet high, when it landed upon the track, and weighed many tons. The mountain on the south side of the track abreast of where the accident occurred rose at a sharp angle to the height of about one thousand feet, and the foot of the mountain had been scored away so as to form a berm, or shoulder, on which to lay the track. The river or stream which flowed through the cañon was on the north side of the track, and immediately adjacent thereto. The grading that had been done at the foot of the mountain on the south side of the stream to form the roadbed was through a formation known as "slide" or "wash," and consisted of boulders of various kinds embedded in clay or gravel. The rock which occasioned the accident slid out of the slope at the south side of the track, which had been made when the grading was done. This slope lay at an angle of about 45 degrees. The bottom of the rock as it lay in the slope before it moved was from 20 to 30 feet from the track, according to the testimony of the plaintiff's witnesses, and at a height vertically of about 6 or 7 feet above the track. In its descent it pushed out of place the track, which was there laid on a fill. It had rained a very little on the night of the accident as the train left Flor-

ence, but there had been no unusual storm or flood or seismic disturbance of any kind, either that night or for some time previously. The night of the accident was not unusually dark. The moon appears to have shone at intervals, but at the place where the accident occurred the track lay in the shadow of the mountain, which made it difficult to see. The headlight of the engine, for some reason, had not burned very brilliantly on the night of the accident. The deceased was at his post when the accident occurred, and saw the rock a moment or so before the collision, and signaled for brakes, but not in time to prevent the disaster.

The defendant did not demur to the case which was made by the plaintiff's testimony, but introduced further evidence, which was to the following effect: The railroad in question had been in operation about eight or nine years previous to the accident. After the contractors who constructed the road turned it over to the Colorado Midland Railroad Company, that company sent a gang of men into Eleven Mile cañon to dress up the track through the cañon and flatten the slopes. They left the particular slope where the accident occurred at an angle of about 45 degrees, which was deemed safe. No special examination had ever been made of the rock which eventually slid out of place, to ascertain if it was safe, except such visual examination as could be made by an inspector or engineer traveling through the cañon on a moving train or hand car. To an inspector thus traveling through the cañon and viewing the rock in question, it extended lengthwise of the cut about 22 feet and up the slope about 16 feet. It was nearly half as large as a freight car, and the lower edge of the rock nearest to the track seemed to have a bearing on other broken rock. From its bottom or lower edge the rock appears to have formed the face of the slope to the height of 16 feet, but it jutted out therefrom a few feet. At its lowest point it was 5 or 6 feet higher than the track, and from 10 to 20 feet distant therefrom. Its weight was about 210 tons, and the soil in which it was embedded was known to be "wash" from the mountain. When the rock slid out of place on the night of the accident, it was found to be wedge-shaped; that is to say, the under side of the rock upon which it rested was not flat, but inclined upwards to some extent, so that it would more readily slide out of place. The chief engineer of the railroad, who had been through the cañon as often as six times a month for several years prior to the accident, and had made a visual examination of the road on such occasions, testified, in substance, that he had seen nothing at the place of the accident which led him to believe that the rock in question was insecure. Another witness testified, in substance, that it would have been impossible to tell whether the rock was insecure by sounding it with a hammer, owing to its great size, and that its peculiar wedge shape was not manifest until it had slid out of place. The testimony for the receiver further showed that about August 1, 1894, he had withdrawn the night track walkers from Eleven Mile cañon, and that from that time forward until after the accident occurred, the cañon was not patrolled but once a day, and then by daylight. This was because the rainy season was supposed to be over, and a night patrol was not deemed necessary.

Upon this showing the trial court directed a verdict for the defendant, holding, apparently, that the facts heretofore recited could not give rise to any difference of opinion, and that all reasonable men would, of necessity, agree that the defendant was without fault. We are not able to concur in that view of the case. It is an elementary rule that a railroad company is under an obligation, both to its employés and to the traveling public, to exercise ordinary care both in the construction and maintenance of its track and roadbed, to the end that they may be reasonably safe for the passage of trains; and the proper discharge of that obligation makes it the duty of a railroad company to be observant of all objects in close proximity to its track, which in the ordinary course of events may impair its safety. If rocks overhang its track, or loose rock is embedded in the slopes of cuts through which its track runs, in such a position that they may be displaced by the ordinary action of the elements, and precipitated upon its track, it should either remove them, or take other adequate precautions to guard against the danger, and render its track reasonably safe. In the case in hand we are unable to say that all reasonable men, listening to the evidence which was adduced at the trial, would have concluded that the receiver had performed his full duty with respect to caring for the safety of the track intrusted to his charge, and was not chargeable with any negligence. The rock which occasioned the accident was known to be a loose rock. It was also known to be embedded in slide or wash on the face of a steep slope, and that it was of enormous weight. If it did not rest upon a secure foundation, it was certain to fall sooner or later, and in its descent was sure to wreck the track, and might occasion great loss, both of life and property. Besides, the continuous action of frost and floods, and the vibration caused by moving trains, would have a tendency to render it more insecure each year unless it rested upon a rock foundation. In view of these considerations, and in view of the fact that the evidence showed that the track through the cañon was not patrolled at night, although trains ran at night as well as by day, it is very probable, we think, that many persons would have reached the conclusion that in the exercise of ordinary care the defendant should have taken the precaution to have ascertained with greater certainty upon what sort of a foundation the rock rested, and should not have trusted to a visual examination, made hastily and at intervals from the platform or window of a moving train. It is manifest from what was discovered when the rock slipped from its place that the defendant would have been guilty of gross carelessness if the true nature of its foundation had been known prior to the accident, and it had been allowed to remain in the slope unsupported. Inasmuch as a demurrer to the evidence was not interposed at the conclusion of the plaintiff's evidence, the case seems to have been tried below, both by the court and counsel, upon the theory that the fall of the rock from a position in close proximity to the track, without any immediate cause except its own weight, would, in itself, warrant an inference of negligence. The receiver accordingly introduced testimony, as above stated, to rebut such inference, and to show from the appearance of the rock while in place that his servants and agents had not been guilty of any

negligence. But whether the testimony thus offered in behalf of the receiver was entirely trustworthy, and whether, if in all respects true, it showed the exercise of ordinary care, and absolved the receiver from all blame, were each questions for the jury. In a given case it is generally the province of the jury to decide, in the light of their knowledge and experience, whether ordinary care has been exercised, since ordinary care is that degree of circumspection which persons of average prudence and intelligence would usually exercise under like circumstances. In a certain class of negligence cases the standard of duty has been so well defined and established by judicial decisions that a court is entitled to declare that a given act or series of acts do or do not amount to culpable negligence. But we are of opinion that the case at bar does not fall within the latter class of cases, and that it was the province of the jury to decide the questions above indicated.

On the trial of the case the plaintiff seems to have claimed that on the night of the accident there was some defect in the headlight of the locomotive, or in the oil which was being used, by reason of which fact it did not give the usual amount of light, and in that way contributed to some extent to the accident. But, as that branch of the case was not discussed on the oral argument, and as the assignments of error predicated thereon were practically abandoned, we do not consider it necessary to notice them, and shall refrain from doing so.

In the course of the trial the court permitted the defendant to prove, by way of mitigating the damages which the plaintiff might recover, that she had collected from an insurance company, after the death of her son, the sum of about $2,000, and for that reason was not entitled to recover to the full extent of her loss. An exception was taken to the admission of such evidence. We think that the testimony should have been excluded, and that the objection thereto was well taken. When an action is brought against a wrongdoer, he is not entitled to have the damages consequent upon the commission of his wrongful act reduced by proving that the plaintiff has received compensation for the loss from a collateral source wholly independent of himself. This doctrine is well established by the authorities, and is applicable to the case in hand. Suth. Dam. (2d Ed.) § 158, and cases there cited. On the second trial the evidence complained of should be excluded. The judgment below is accordingly reversed, and the case is remanded for a new trial.

SANBORN, Circuit Judge (dissenting). I am unable to resist the conclusion that there is no evidence in this case of any negligence on the part of the receiver. The test of absence of ordinary care here is: Would a man of usual prudence and sagacity have anticipated, and have taken steps to guard against, the fall of this rock, under all the circumstances of this case? The rock which slid upon the track was half as large as a car. It was so embedded in the side of the mountain that it was visible only to the extent of 18 inches. No ordinary inspection or test by the use of hammer or bar could determine that it would ever fall. The railroad had been constructed eight years before this accident occurred, and no cutting or grading or change in the face

of the mountain about the rock had been made during all this time. No flood, storm, or other disturbance of the earth or of the elements occurred shortly before its fall, which might have caused it. A state of things once proved to exist is presumed to continue. When the face of a mountain is changed by grading, cutting, or filling, a duty of watchfulness and care is imposed during the first few months thereafter in order to guard against the natural effects of such acts. But the longer a rock or a mountain side remains in the same position and condition, the less becomes the need, and hence the duty, of watchfulness, until finally the probability that they will not move or change in the absence of some warning, and of some active and apparent cause, becomes conclusive. This rock had remained embedded in the mountain side unmoved through the storms and changing seasons of eight years after the railroad was built and the grading done about it, and I have been forced to the same conclusion as the trial judge that a man of ordinary prudence would not have anticipated that it would fall without apparent cause or warning, and would not have taken any steps to fasten it in its position, or to inspect it more carefully than the receiver did. An injury that could not have been foreseen or reasonably anticipated as the probable result of an act or omission lays no foundation for an action (Railway Co. v. Elliott, 12 U. S. App. 381, 386, 5 C. C. A. 347, 350, and 55 Fed. 949, 952), and it seems to me that there was no human probability that this rock would slide from its mountain bed after it had remained in the same situation for eight years, and that no man could have anticipated its fall as the natural or probable result of a failure to inspect or secure it